UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
ANGELO C.,

                              Plaintiff,

        v.                                                    **23-CV-6283-A**
                                                              **DECISION AND ORDER**

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
_____


## I.      INTRODUCTION

The Plaintiff Angelo C., brings this action against the Commissioner of Social Security (hereinafter the "Commissioner"), seeking judicial review of the Commissioner's determination denying Plaintiff Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act. Plaintiff (Dkt. No. 6) and the Commissioner (Dkt. No. 8) have filed cross-motions for judgment on the pleadings. For the reasons set forth below, the Plaintiff's motion is **GRANTED** to the extent that the matter is remanded for further administrative proceedings, and the Commissioner's motion is **DENIED**.

### A.  Factual Background and Procedural History

Plaintiff was born in 1987, and on December 15, 2020, he filed an application for DIB and SSI alleging disability beginning on December 11, 2020. (Tr. 15, 78, 334).[1]

_____

[1] References preceded by "Tr." are to Bates-stamped pages in the consecutively paginated transcript, consisting of 2,234 pages, of proceedings before the Social Security Administration. Dkt. No. 3.

Plaintiff, who holds a GED, previously worked as a tow truck operator and sales associate (Tr. 321).  His claim for disability was based on the following conditions: traumatic brain injury; lesion or tumor on the brain; and seizure disorder. (Tr. 320).

The claims were denied initially on February 18, 2021, and upon reconsideration on October 8, 2021. (Tr. 143-48). Per Plaintiff's request (Tr. 185-86), he appeared and testified, with counsel, at a hearing before ALJ Jennifer Gale Smith ("the ALJ") on March 3, 2022. (Tr. 42-76). The ALJ issued an unfavorable decision on June 9, 2022, finding Plaintiff not disabled. (Tr. 15-29). The ALJ's decision became final when, on April 11, 2023, the Appeals Council denied Plaintiff's request for review. (Tr. 1-3). This action followed.

### B.  The Evidence

In 2010, Plaintiff sustained a traumatic brain injury (TBI), a fractured skull, an orbital fracture, ear/pinna laceration, and deafness in his left ear after a vehicle fell on him while he was working under it and pinned him for 15 to 20 minutes. (Tr. 55, 539). Following the accident, in 2012 and 2013, Plaintiff had two grand mal seizures, and an MRI conducted after his second seizure in June of 2013 revealed an intracortical/subcortical lesion in the right middle front gyrus of his brain which was consistent with a low grade glioma tumor.  Scans performed in 2017 revealed a small, right frontal intracortical and subcortical enhancing lesion in the right middle front gyrus, while 2020 imaging showed a similar sized, enhancing lesion in the same location but now with ring enhancement. (Tr. 539-540).

### 1.  Treatment History

In March 2018, Plaintiff underwent an Integrative Cognitive Rehabilitation Program speech pathology assessment by speech and language pathologist Kasie Gilmartin M.S. (Tr. 1905). A cognitive evaluation of Plaintiff performed by the speech pathologist revealed mild impairments in memory and language. (Tr. 1905). "Further evaluation using percentile scores revealed more moderate to severe deficits across all cognitive domains." (Tr. 1905).

In August 2018, Plaintiff needed emergency psychiatric treatment in August 2018 when he endorsed suicidal ideation. (Tr. 1997). Plaintiff had thoughts of shooting himself with a BB gun after a verbal argument with his wife. (Tr. 1997). Dr. Elizabeth Mott noted that Plaintiff had a history of TBI with seizures a brain lesion in the right frontal lobe. (Tr. 1997). "In my clinical opinion, a lesion in the frontal lobe and TBI were most likely the cause of his intermittent emotional dysregulation." (Tr. 1997).

Plaintiff was treated by Dr. Prity Rawal in June 2020 and September 2020 for seizure disorder follow up. (Tr. 385, 392). An MRI of Plaintiff's brain showed a stable size of lesion involving the subcortical white matter of the right frontal lobe that was ring enhancing with internal low signal. (Tr. 385). "Suspect neurocysticercosis based on the ring enhancement." (Tr. 385). Plaintiff also had depression and anxiety, for which he was going to Livingston County mental health. (Tr. 385). He was prescribed Tegretol and Prozac. (Tr. 386-387).

In July 2020, Plaintiff was treated by Dr. Andrew Hilburger for an evaluation of his head injury. (Tr. 1242). Plaintiff was working underneath a car, and the jack gave well, and the oil pan in the car struck him in the head. (Tr. 1242). Soon after, Plaintiff began having seizures, and was started on carbamazepine. (Tr. 1242). Plaintiff reported he was having a number of issues, including a bad temper; difficulty controlling impulses; becoming verbally abusing; and mood issues. (Tr. 1242). He stated that he "will not notice things to the right side of his field of vision." (Tr. 1242). He would walk into the right side of doors. (Tr. 1242). He was diagnosed with localization-related focal partial symptomatic epilepsy and epileptic syndromes with simple partial seizures. (Tr. 1244). Dr. Hilburger believed Plaintiff presented with what appeared to be a partial onset seizure disorder. (Tr. 1244).

Plaintiff was treated at Urgent Care for back pain in January 2021 after lifting his kids and twisting his lower back. (Tr. 546). He was also treated for anxiety in February 2021, and Inderal was added. (Tr. 544). His dosage of Prozac was also increased. (Tr. 544).

In March 2021, Plaintiff was treated by Dr. Webster Pilcher in consideration of his right frontal brain lesion. (Tr. 539). Plaintiff described an accident in 2010 when a car fell on him, resulting in a skull fracture, orbital fracture, ear/pinna laceration and deafness in his left ear. (Tr. 539). In 2017 and 2020, scans revealed ring enhancement of his internal/subcortical lesion in the right MFG. (Tr. 540). Plaintiff's wife of ten years described that Plaintiff's mental health had deteriorated. (Tr. 540). He would get irritated, agitated, and had anger management issues. (Tr. 540). During the visit,

4

Plaintiff himself described anxiety and depression and a significant change in his mood. (Tr. 540). He followed up in August 2021, and Plaintiff's wife described an incident where Plaintiff almost got into a car accident, then an argument ensued, and "he got out of the car and he lay down in the middle of the road waiting for a vehicle to kill him." (Tr. 747). In the absence of overt seizure activity, Dr. Pilcher did not attribute his behavior to seizure activity or his subcortical frontal lesion. (Tr. 748). Dr. Pilcher recommended that Plaintiff be evaluated by neurology and psychiatry. (Tr. 748).

Plaintiff returned to Dr. Hilburger in June 2021, with concerns about Plaintiff 's poor impulse control, anger, and frustration. (Tr. 1247). Plaintiff was also having "a little bit more difficulty" with his memory. (Tr. 1247). In September 2021, Plaintiff reported hearing loss, including loss of high pitch perception, loss of low pitch perception, and difficulty with voices in crowded rooms. (Tr. 1210). Plaintiff reported that he occasionally heard things and saw things. (Tr. 1248). Dr. Hilburger confirmed that Plaintiff was having difficulty and "a lot of his symptoms could be related to a frontal lobe injury" and that he had pseudobulbar affect. (Tr. 1248). While Plaintiff reported that some of the drugs he was prescribed helped, if he did not take the drug in combination with his other medications "he becomes quite irritable and hostile at times." (Tr. 1249).

In October of 2021, Plaintiff was seeking mental health treatment and reported that he did not meet the criteria to have an intake with Strong Ties, and MSW

Samantha Benwitz stated she would send him a list of mental health clinics closer to home. (Tr. 2133).

Plaintiff's former psychotherapist David Schwab provided a statement in May 2022, which referenced Plaintiff's treatment history from 2013 to 2016. (Tr. 2144). Plaintiff acknowledged a history of poor impulse control; low frustration tolerance; losing his temper; and conflict with the mother of his child. (Tr. 2144). Plaintiff reported he could get so distressed and activated that he could self-harm and act out aggressively. (Tr. 2144). Plaintiff had variable moods with episodes of depression and anxiety; impulse control with angry acting out; and difficulties with focus and concentration. (Tr. 2144). It was noted that Plaintiff had been in special education with a chaotic childhood. (Tr. 2145).  The psychotherapist concluded:

> [Plaintiff's] mental health and physical difficulties are chronic in nature beginning with his mother's drug use while being pregnant with him. His history of emotional and physical trauma exacerbates his chronic conditions. *Id*.

### 2.  Opinion Evidence

On February 3, 2021, Plaintiff underwent a psychiatric consultative evaluation by Christine Ransom, Ph.D.  Dr. Ransom opined that Plaintiff had no limitations in: understanding, remembering, and applying simple and complex directions and instructions; using reasoning and judgment to make work-related decisions; interacting adequately with supervisors, co-workers, and the public; maintaining personal hygiene and appropriate attire; and being aware of normal hazards and taking appropriate precautions. (Tr. 528). Dr. Ransom opined that Plaintiff had mild

evidence of limitations in: sustaining concentration and performing a task at a consistent pace; sustaining an ordinary routine and regular attendance at work; and regulating emotions, controlling behavior, and maintaining well-being. (Tr. 528).  Dr. Ransom diagnosed Plaintiff with mild panic disorder and major depressive disorder, currently in remission on medication; and recommended that he continue with medication management for his depression, anxiety, and panic disorder – most likely six months to one year. (Tr. 528-29). Dr. Ransom concluded Plaintiff only had a mild psychiatric condition that would mildly interfere with his ability to function on a daily basis. (Tr. 528).

Also on February 3, 2021, Plaintiff underwent a consultative internal medicine examination with Dr. Harbinder Toor, M.D., where he reported a history of migraines, seizures, and a brain tumor since a 2010 injury. (Tr. 520). Dr. Toor diagnosed Plaintiff with history of: head injury, traumatic brain injury, migraine headaches, seizures, asthma, hypertension, and on-and-off back pain. (Tr. 552). Dr. Toor opined that Plaintiff's headaches could interfere with his routine, that he should avoid irritants or other factors that can precipitate asthma, and he should be careful with driving and heights due to his history of seizures. (Tr. 523).

On April 30, 2021, Dr. Rawal, who previously treated Plaintiff in June 2020 and September 2020 (Tr. 385, 392), provided a medical opinion, diagnosing Plaintiff with seizure disorder, brain lesion, depression, and anxiety, and a history of TBIs and noted that Plaintiff's symptoms included mood changes, mood disorder, hallucinations, memory loss, and seizures. (Tr. 615).

On February 3, 2022, Dr. Rawal completed a brain injury residual functional capacity questionnaire, indicating that he treated Plaintiff for the last four years for his traumatic brain injury. (Tr. 1266). Dr. Rawal noted that Plaintiff was stable on his medications. (Tr. 1266). His symptoms included balance issues, sensory disturbance, and memory problems; poor coordination; confusion, depression, emotional lability, and tremors. (Tr. 1266). Dr. Rawal made a clinical finding that his symptoms were worsening.   (Tr. 1267).   Dr. Rawal opined that Plaintiff's symptoms frequently interfered with his attention and concentration, and the impairments could be expected to last at least twelve months. (Tr. 1267). Plaintiff would need to take daily unscheduled breaks during work of 20 to 30 minutes where he would need to sit quietly. (Tr. 1268). He needed to avoid even moderate exposure to extreme cold and avoid exposure to: extreme heat, high humidity, perfumes, soldering, solvents, cleaner and chemicals. (Tr. 1271). Plaintiff was capable of low-stress jobs and would miss about four days of work per month. (Tr. 1271-72). Plaintiff could follow simple (but not complex) directions and understand and explain his limitations after his brain injury. (Tr. 1272).

### C.  The ALJ's Decision

The ALJ determined, under step one, that Plaintiff had not engaged in substantial gainful activity since December 11, 2020, the alleged onset date. (Tr. 18). Under step two, the ALJ determined that Plaintiff had the following severe impairments: brain lesion, seizure disorder, asthma, migraine headaches, depressive disorder, anxiety disorder, attention deficit hyperactivity disorder, panic disorder, and

obesity.  (Tr. 18).  At step three, the ALJ concluded that Plaintiff's impairments did not meet or equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (Tr. 19).  The ALJ next determined that Plaintiff had the residual function capacity (RFC) to performed that excluding certain conditions Plaintiff "should work at simple, routine, and repetitive tasks; claimant should work in a low-stress job, defined as occasional decision-making, occasional judgment required, and occasional changes in the work setting; claimant should work at goal-oriented work, rather than production-pace rate work; and claimant should have occasional contact with co-workers and supervisors, and no public contact. (Tr. 23-32).  At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work as a machinist. (Tr. 32).  At step five, the ALJ determined, based upon the testimony of the vocational expert, and considering Plaintiff's age, education, work experience, and RFC, that the Plaintiff could make a successful adjustment to other work that exists in significant numbers in the national economy, including as a photocopy machine operator, a marker, a router, an addresser, a document preparer, and a tube operator. (Tr. 33-34). On that basis, the ALJ determined that Plaintiff was "not disabled." (Tr. 35).

### D.  The Parties' Contentions

In seeking this Court's review of the ALJ's determination, Plaintiff argues that the Commissioner erred in determining that his impairments did not prevent him from performing substantial gainful activity as such determination is not supported by substantial evidence. (Dkt. No. 6-1). Specifically, Plaintiff argues that the ALJ failed to

evaluate a cognitive evaluation performed by speech and language pathologist Kasie Gilmartin M.S., in March 2018, which determined that Plaintiff had "moderate to severe deficits across all cognitive domains." (Tr. 1905). Those domains included cognition, including attention, memory, executive function, language, and visuospatial skills. (Tr. 1905). Plaintiff further argues that the ALJ failed properly to evaluate multiple limitations pertaining to Plaintiff's absenteeism or time off task. Accordingly, Plaintiff requests that the case be remanded.

Defendant responds that the Commissioner's decision is supported by substantial evidence and, therefore, should be affirmed. (Dkt. No. 8-1).

## II.  LEGAL STANDARD

### A. Standard of Review

In reviewing a final decision of the SSA, a district court "is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. It is not this Court's function to make a *de novo* determination as to whether the claimant is disabled; rather, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn" to determine whether the SSA's findings are supported by substantial evidence. *Id*.

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *42 U.S.C. § 405(g)*; *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982) ("Congress has instructed ... that the factual findings of the Secretary, if supported by substantial evidence, shall be conclusive."). "Under this 'very deferential standard of review,' 'once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise.'" *Bonet ex rel. T.B. v. Colvin*, 523 Fed.Appx. 58, 58-59 (2d Cir. 2013) (italics omitted) (quoting *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The issue is not whether substantial evidence supports the claimant's argument, but "whether substantial evidence supports the ALJ's decision." *Bonet ex rel. T.B.*, 523 Fed.Appx. at 59 (italics omitted).

"In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d at 151 (internal quotations omitted).

## B. Legal Standard to Determine Disability

To determine whether a person claiming to be disabled is eligible for benefits under the Act, the ALJ follows a familiar five-step sequential evaluation, determining: (1) whether the claimant is engaged in substantial gainful work activity; (2) whether the claimant has any "severe" impairments that significantly restrict his or her ability to work; (3) whether the claimant's impairments meet or medically equal the criteria of any listed impairments in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"),

and if they do not, what the claimant's residual functional capacity ("RFC") is; (4) whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work; and (5) whether the claimant's RFC permits him or her to perform alternative substantial gainful work which exists in the national economy in light of her age, education, and work experience. *See Bowen v. City of New York*, 476 U.S. 467, 470-71 (1986); *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *see also* 20 C.F.R. §§ 404.1520 and 416.920(a).

In reaching her determination, the ALJ need not recite every piece of evidence that contributed to the decision so long as the record permits a reviewing court the ability to glean the rationale of the ALJ's decision.   *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013). Nevertheless, "[b]ecause a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Specifically, the ALJ must "investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011); *see also*, *Sims v. Apfel*, 530 U.S. 103, 111, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000) (ALJ has a "duty to investigate the facts and develop the arguments both for and against granting benefits.").

III.    **ANALYSIS**

A. **The ALJ's Failure to Evaluate the March 2018 Cognitive Evaluation Which Indicated That Plaintiff Had Moderate To Severe Deficits Across All Cognitive Domains Warrants A Remand**

The medical records submitted in this case included, *inter alia*, over a decade's worth of Plaintiff's medical records from University of Rochester Strong Memorial Hospital covering the period from March of 2011 through December of 2021. (Tr. 1282-2135). Included in those medical records are a cognitive evaluation performed by speech and language pathologist Kasie Gilmartin M.S., in March 2018, which determined that Plaintiff had "moderate to severe deficits across all cognitive domains." (Tr. 1905). Such evaluation was performed because Plaintiff noticed changes in his cognition over the course of three years. (Tr. 1900). Additionally, a review of the records from Strong demonstrates that various providers who treated Plaintiff during that period noticed a decline in Plaintiff's cognitive capacity over time. Specifically, the records show that when Plaintiff was treated earlier-on in 2012, which was closer in time to the 2010 traumatic brain injury suffered by the Plaintiff, his providers characterized Plaintiff's attention span as being "good." (Tr. 1344, 1362). Over time, however, a consistent decline in Plaintiff's attention span was noted, and every provider note addressing cognition for visits during 2017 and 2018, downgraded Plaintiff's attention span to "fair." (Tr. 1751, 1777, 1996, 2030). Finally, such records demonstrate that Plaintiff had been diagnosed: with possible cognitive impairment" by Dr. Mott (Tr. 1993, 2026); with "head trauma and a cognitive communication deficit"

by Dr. Khera (Tr. 2020); and as have "some limitations cognitively" by his psychiatric social worker. (Tr. 1355).

Under the applicable regulations, *see*, 20 CFR §404.1520c, the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." *Id*. §404.1520c(a). Instead, when evaluating the persuasiveness of medical opinions, the Commissioner must consider the following five factors: (1) supportability; (2) consistency; (3) relationship of the source with the claimant, including length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship, and whether the relationship is an examining relationship; (4) the medical source's specialization; and (5) other factors, including but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA] disability program's policies and evidentiary requirements." *Id*.  §404.1520c(c).  Using these factors, the most important of which are supportability and consistency, the ALJ must articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id*. § 404.1520c(b).  "An ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in his decision," so long as he has weighed "all of the evidence available to make an RFC finding that was consistent with the record as a whole." *Pike v. Kijakazi*, No. 23-CV-583-A, 2024

WL 554300, at *5 (W.D.N.Y. Feb. 12, 2024)(quoting *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013)).

In her decision, the ALJ failed to mention—much less evaluate—this evidence of Plaintiff cognitive deficits and decline.  Moreover, this evidence, which was provided in March of 2022, was not in evidence when the State Agency review sources offered their opinions in February and July of 2021. (Tr. 83, 115). Although the records are from two years before the alleged onset date, such historical evidence may certainly be relevant in the assessment of Plaintiff's present and future cognitive ability, considering the fact that "[a] claimant's intellectual ability is not typically something that improves with time." *Douglass v. Astrue*, 496 Fed.Appx. 154, 156 (2d Cir. 2012). Stated simply, the ALJ failed to explain her decision to disregard this evidence, which includes the only evidence in the record regarding cognitive testing performed on the Plaintiff.  Notably, the ALJ rejected the opinions of the two State Agency review psychologists who determined that the claimant did not have a severe mental impairment or combination of impairments, and instead, determined that "the additional evidence received at the hearing level shows the claimant to be exhibiting behavioral and cognitive difficulties."  (Tr. 22) Despite such finding, however, the ALJ summarily concluded that Plaintiff had "moderate limitations" in understanding, remembering, or applying information; in interacting with others; in concentrating, persisting, or maintaining pace; and in adapting or managing oneself. (Tr. 22).  The rationale for the ALJ's characterization of such cognitive limitation as "moderate" is not apparent on the record before this Court.  Especially considering the cyclical

nature of mental illness symptoms commonly exhibited by those suffering from it, the ALJ erred in failing to discuss those findings that suggested that Plaintiff's cognitive limitations were more significant than she found. *See Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (recognizing that "[c]ycles of improvement and debilitating symptoms [of mental illness] are a common occurrence," and holding that it is legal error for an ALJ to fail to focus only on areas of improvement); *Faure v. Comm'r of Soc. Sec.*, No. 22-CV-1571 (KHP), 2023 WL 5013282, at *11 (S.D.N.Y. Aug. 7, 2023)(same and noting "the ALJ must seek additional information to fill in the obvious gaps and internal inconsistencies in the medical opinions on which she relied.").

"[T]he leeway given to ALJs to make common sense judgments does not typically extend to the determination of mental limitations, which are by their very nature highly complex and individualized." *Lilley v. Berryhill*, 307 F. Supp. 3d 157, 161 (W.D.N.Y. 2018) (quotations omitted); *Merriman v. Comm'r of Soc. Sec.*, No. 14 Civ. 3510 (PGG/HBP), 2015 WL 5472934, at *19 (S.D.N.Y. Sept. 17, 2015) ("[T]he duty to develop the record is particularly important where an applicant alleges he is suffering from a mental illness, due to the difficulty in determining whether these individuals will be able to adapt to the demands or stress of the workplace." (quotations, citation, and alteration omitted)). This is because "the effect a mental impairment has on one's ability to work is not the sort of inquiry susceptible to lay evaluation" and accordingly "[w]here serious mental illness is at issue, the ALJ may not make ... seemingly common-sense judgments about a claimant's abilities." *Stoeckel v. Comm'r of Soc. Sec.*, No. 18-CV-1475-FPG, 2019 WL 5445518, at *3 (W.D.N.Y. Oct. 24, 2019); *James*

*R. v. Comm'r of Soc. Sec.*, No. 18-CV-06497-FPG, 2021 WL 3361161, at *3 (W.D.N.Y. Aug. 3, 2021) ("The ALJ could not assess the scope of Plaintiff's mental impairments solely through her own common sense and lay judgment."). Indeed, in the case of mental health impairments—at issue here based upon Plaintiff's TBI, brain tumor, history of seizures, and cognitive limitations—the opinions offered by treating providers are "all the more important," given those impairments are "not susceptible to clear records such as x-rays or MRIs," and "depend almost exclusively on less discretely measurable factors, like what the patient says in consultations." *Flynn v. Comm'r of Soc. Sec.*, 729 F. App'x 119, 122 (2d Cir. 2018); *see also, Kim T. v. Comm'r of Soc. Sec.*, No. 1:20-CV-01237 EAW, 2022 WL 2114798, at *5 (W.D.N.Y. June 13, 2022).

This evidence is also pertinent to the ALJ's determination regarding Plaintiff's RFC and ability to find a job. (Tr. 33)  All of the potential jobs involve a reasoning level of two or higher, which requires the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete variables in or from standardized situations." *See* Dictionary of Occupational Titles app. C.  Certainly, the evidence regarding cognitive limitations may well impact any determination regarding Plaintiff's ability to carry out detailed instructions.  Although the ALJ did incorporate an assessment of Plaintiff's cognitive limitations, as she found them, into her assessment of Plaintiff's RFC, *cf., Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 32 (2d Cir. 2013), because her findings regarding those limitations failed to address the medical evidence in the Strong

records, this Court is unable on this record to determine whether her determination in that regard is supported by substantial evidence. *Linda H. v. Comm'r of Soc. Sec.*, No. 19-CV-1244-LJV, 2021 WL 2075437, at *3 (W.D.N.Y. May 24, 2021) ("this Court has no idea whether the ALJ missed them, ignored them, or disagreed with them for some legitimate reason. And that legal error requires remand.")

### B. The ALJ Failed Properly To Evaluate Limitations Regarding Absenteeism

Dr. Rawal opined that Plaintiff would have good days and bad days and that Plaintiff would miss about 4 days of work per month as a result of impairments or treatment. (Tr. 1272).[2] The ALJ summarily rejected this limitation simply stating that it was "purely speculative and not based on any documented observation or evaluation." (Tr. 32).

"Although under the new regulations the ALJ is not required to give specific evidentiary weight to a particular medical opinion, [s]he is still required to articulate how he considered the medical opinion, including explaining how he considered the 'supportability' and 'consistency' factors." *Jaleesa H. v. Comm'r of Soc. Sec.*, 580 F. Supp. 3d 1, 8-9 (W.D.N.Y. 2022). "Both supportability and consistency in part require comparison of the medical opinions with other medical sources." *Mark K. v. Comm'r of Soc. Sec.*, No. 20-CV-833, 2021 WL 4220621, at *4 (W.D.N.Y. Sept. 16, 2021)

---

[2] Two other doctors also offered opinions which indicated that Plaintiff's headache and psychiatric condition would impact Plaintiff's ability to work.  Specifically, Dr. Toor opined that Plaintiff's headaches could interfere with his routine (Tr. 522), and Dr. Ransom opined that Plaintiff had a "mild" psychiatric condition that would "mildly" interfere with his ability to function on a daily basis. (Tr. 528).

(citing 20 C.F.R. § 404.1520c(c)(1)-(2)).  The ALJ's summary rejection of Dr. Rawal's opinion regarding absenteeism "precludes the Court from undertaking meaningful review" of the ALJ's decision to reject it.  *Jaleesa H. v. Comm'r of Soc. Sec.*, 2022 WL 174337, at *6, 580 F.Supp.3d 1; *see also William B. J. v. Comm'r of Soc. Sec.*, No. 6:20-CV-989, 2022 WL 344059, at *5 (N.D.N.Y. Feb. 4, 2022).  Accordingly, remand is also required on this basis.

On remand, the ALJ must articulate in a more detailed fashion her assessment of Dr. Rawal's opinion, including how she considered the "supportability" and "consistency" factors. *See, e.g., Prieto v. Comm'r of Soc. Sec.*, No. 20-CV-3941 (RWL), 2021 WL 3475625, at *13 (S.D.N.Y. Aug. 6, 2021) ("[R]ather than analyzing the supportability and consistency factors as applied to Dr. Long's opinion, the only reasoning the ALJ provided was entirely conclusory; the ALJ said only that Dr. Long's opinion was 'supported by the medical evidence of record and by her underlying examination.' Such a conclusory statement is an insufficient explanation of the supportability factor and is grounds for remand." (internal citation omitted)); *Matthews v. Comm'r of Soc. Sec.*, No. 1:17-cv-00371-MAT, 2018 WL 4356495, *3 (W.D.N.Y. Sept. 13, 2018) ("The ALJ's failure to explain his assessment of this portion of Dr. Baskin's opinion prevents the Court from meaningfully reviewing his decision, and warrants remand.").  This error is particularly problematic here since the vocational expert testified that only one unexcused absence would be tolerated per month in the workplace, and any more "rules out all employment." (Tr. 73).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (Dkt.

No. 6) is **GRANTED** to the extent that the matter is remanded for further administrative

proceedings, and the Commissioner's motion for judgment on the pleadings (Dkt. No.

8) is **DENIED**. The Clerk of Court is directed to enter judgment and close this case.

**IT IS SO ORDERED**.

*s/Richard J. Arcara*
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated:  February 22, 2024
        Buffalo, New York